## 3329. HOLTON *v.* THE STATE.

1. The numerous exceptions to excerpts from the charge of the court are without merit. The charge is a fair, full, clear, and correct presentation of the law applicable to the issues made by the evidence, and is not justly subject to adverse criticism.

2. A new trial should have been granted on the ground of newly discovered testimony. The statutory requirements in support of this ground were fully complied with. The proposed evidence is not merely cumulative and impeaching in character, and is vitally material to the defense, and, if believed by the jury, would probably lead to a different result.

DECIDED JUNE 7, 1911.

Conviction of manslaughter; from Mitchell superior court—Judge Park. March 4, 1910.

*Davis & Merry, Spence & Bennet, Roscoe Luke, E. E. Cox,* for plaintiff in error.

*W. E. Woolen,* solicitor-general, *F. A. Hooper, J. H. Tiplon. H. C. Dasher Jr.,* contra.

HILL, C. J. Howard Holton was indicted for murder, and was found guilty of voluntary manslaughter. His motion for a new trial being overruled, the case is here for review.

1. The amended motion for a new trial contains exceptions to numerous excerpts from the charge of the court.' It is unnecessary to discuss each one of these exceptions, for we have made a careful examination of them in connection with the evidence and the entire charge, and we find no error in any of them. We have rarely read instructions that more clearly, fairly, and fully presented all the issues, and have read none less vulnerable to attack. The exceptions to the rulings relating to testimony are also without merit, and a charge on the law of voluntary manslaughter was demanded, under several viewpoints of the evidence. The complaint made in the motion that, after the jury had been charged with the case, three of them separated from their fellows, who continued a consideration of the case while they were absent, in the light of the counter-showing made by the State is unsupported, and clearly not entitled to serious consideration. Indeed, from a very careful consideration of the voluminous record, we are satisfied that the trial was conducted in all respects without error, and the verdict, under the evidence presented and the law applicable thereto, is fully authorized.

2. We have concluded, however, that the plaintiff in error is entitled to another trial, on the ground of newly discovered evidence. A brief statement of the evidence adduced at the trial, in connection with that which is alleged to be newly discovered, will, we think, clearly show the correctness of this conclusion. The evidence preceding the homicide and up to its actual occurrence is not in conflict. The decedent and the accused, who had been friends, were together at the barber shop of the former. Both men were under the influence of intoxicants. While in this condition they began to throw nickels in the game of crack-a-loo. The decedent won repeatedly, whereupon the accused made some insinuations against the fairness of his play. This was resented by the decedent, who denounced the implication as a "damned lie." The accused thereupon threw his hand in the direction of his hip-pocket, and the decedent met this motion by taking a pistol from behind the mirror near his barber chair. The accused relieved the tension of the situation thus produced by an invitation to drink, which invitation was declined by the decedent on the ground that the accused had insulted him by the accusation made as to the fairness of his play. The decedent replaced his pistol behind the mirror, and the accused left the shop, and was absent for about 35 or 40 minutes. He returned to the shop, and, on entering, immediately referred to the difference between the decedent and himself, and intimated to the decedent that he would not repeat outside of the shop what he had said, and invited him to go out into the rear of the shop. The decedent accepted the invitation. The accused held the back door open for him to pass out, and they both went outside.

The evidence as to what occurred outside is in conflict. The witnesses for the State testified that the decedent went out with his hands in his pocket, apparently making no demonstration to draw a weapon of any sort; that immediately after the door was closed they heard the voices of the two men angrily recurring to the incident of the game of crack-a-loo, the accused repeating the insinuation of unfairness in the play by the decedent, and the decedent denouncing the insinuation as a "damned lie," and that this verbal dispute was followed immediately by five shots in rapid succession. The decedent, upon being shot, turned and endeavored to retrace his steps, and in a few seconds fell to the ground. The

accused ran away from the scene. Several persons rushed to the scene of the shooting, and found the decedent lying on the ground in the article of death. Near his left hand was found a medium size unopened pocket-knife. It may be stated here that there is some contention in the evidence as to whether this pocket-knife belonged to the decedent, and as to whether it was in his possession when he was shot; it being claimed by the prosecution that he had no knife in his possession, except a little pearl-handled knife which was found by the undertaker in his vest-pocket, and that the knife found had been placed on the ground by friends of the accused, several witnesses testifying that they made an unsuccessful search for a knife immediately after the killing. The theory set up by the accused was that the knife was the property of the decedent, and he endeavored to account for its being closed by insisting that the decedent, after he was shot, closed the knife, voluntarily or involuntarily, or that some of his friends closed it after he had been shot.

There is evidence on both sides of this contention, and the jury were authorized to believe, even from the State's evidence, that the knife was in fact the knife of the decedent. There is no evidence to authorize the inference either that it was closed by the decedent after he was shot, or was closed by one of his friends; the only rational theory on this point being that the decedent had succeeded in taking his knife from his pocket, and before he had opened the blade one of the shots from the pistol of the accused struck the bone of his right arm near the elbow, and the shock thereby produced caused the fingers to unclasp and the knife to fall to the ground. The testimony for the State fails to disclose the attitude of either man at the exact moment of the homicide. The last seen of the two men by these witnesses was when they were going outside, and the decedent then had his hands in his pockets, and the accused had not drawn his pistol, and the last words heard by the witnesses were in an angry conversation between the two, which was followed immediately by a rapid succession of shots, five in number. The decedent was hit three times, twice in the breast (the balls going through his body, one through his heart), and once in the elbow of his right arm. The other two bullets are not accounted for.

The accused introduced two witnesses to the conduct of the two men at the exact time of the homicide. These two witnesses concur in the testimony that the decedent was advancing on the accused with an open knife; that the accused was backing from him, and warning him not to come on him with the knife, but that he continued to advance, when the accused drew his pistol and shot him. One of these witnesses was a servant of the accused, and had been in his employment for over three years, and ran away with the accused from the scene of the homicide. The other witness was a negro boy related to the first witness, who gave the same account. This latter witness was impeached by proof of contradictory statements. The accused, in his statement to the jury, after giving an account of the preliminary incidents, substantially as related in the testimony in reference to the crack-a-loo game and the angry discussion that arose relating thereto, stated that he returned to the barber shop after this dispute for the purpose of getting a half pint of whisky to carry home with him; that he asked the decedent for the whisky, and the decedent went to the rear end of the store and got the half pint, and he paid him for it, and the decedent then asked him to take a drink out of a quart bottle he got out of his desk; that after taking the drink he went to the rear of the shop to get a drink of water; that when he went to the rear end of the shop the decedent came back and renewed the dispute in reference to the crack-a-loo game, referring to the insinuation the accused had made against him that he had taken his money away from him; that the decedent, while talking to him, was standing near the door with his open knife cutting on the side of the door. As to what then occurred, the statement of the accused was as follows: Jim Bob Cochran (the deceased) said, "Howard, you are a God damn littler man than I thought you were, to get mad about a nickel," and I said, "I ain't mad, Jim Bob, but you know you got all the money," and he said, "You are a God damn lie," and I said, "Jim Bob, don't call me a God damn lie," and he repeated the epithet, and I said, "You are another one," and he then started to me with his knife open in a drawn position and said, "Take it back." He was nearly in reaching distance of me, and I began to back off as fast as I could, and I said, "Jim Bob, don't come on me with that knife," and he kept coming, and I shot twice to stop him, and stumbled over something, and he continued to

27

rush at me, trying to cut me, when I shot two or three more times as fast as I could, trying to stop him, and when the pistol quit firing, I ran off.

The statement of the accused and the testimony of his two witnesses are in accord, and, if true, would make a case of self-defense. The jury, however, disregarded both the statement and the corroborative evidence, and accepted the theory of mutual combat as one of the theories arising from a consideration of the State's evidence. This is, in substance, the material evidence both for the State and the defense. While the evidence for the State authorized the verdict, it did not demand it. It was shown that the decedent had his hand in his pocket when he left the shop and went into the rear yard, and it is also shown that he did in fact have a knife. The evidence for the State is silent as to what he was endeavoring to do with the knife, or was apparently endeavoring to do with it, when he was shot; but the direction of the shots show that he was facing the accused, and the rapidity with which he was shot would warrant the inference that the accused felt the pressure of some emergency. As before intimated, it is clear that that shot which struck the arm of the decedent produced a shock which caused the hand to open spasmodically and the knife to drop. This is the theory of the physician, and it is the most rational theory. The shot evidently struck the arm before the decedent had time to open the knife. It does not appear what was the number of this shot. The writer of this opinion is not prepared to hold as a matter of law that a person who sees another advancing on him with a knife in his hand is compelled to wait until the blade is open before he would be authorized to defend himself. It would depend entirely upon the circumstances as they appeared to the person at the time he acted—the distance between the two, whether there was an apparent effort to open the blade, the size of the knife, and the character of the assailant. In other words, even from the evidence in behalf of the prosecution, the theory of self-defense is not entirely excluded as a rational hypothesis.

Now, in this situation let us briefly set out the testimony alleged to be newly discovered, in order that we may determine whether it is material, and, if credited on a second trial, would probably lead to a different result. It may be stated that the statutory requirements as to preliminary proof in support of this ground of

the motion are fully complied with. Ignorance on the part of the accused and his counsel of the existence of this evidence alleged to be newly discovered, and inability with reasonable diligence to have discovered and to have produced it at the trial, and the credible character of the witnesses who are relied upon to give the evidence, are all set out in support of this ground of the motion. The affidavits of two white men, farmers living near the town, are presented. The affiants swear that just shortly before the homicide, they went to the shop of Jim Bob Cochran, the decedent, for the purpose of buying some whisky from him; that on reaching the shop they saw him standing in the door with a pistol in his hand; that they asked him what he was doing with the pistol, and he replied, "I came near killing Howard Holton a minute ago, and am sorry that I did not do it;" that they asked him what was the matter, and he said, "I won a few nickels from him in a crack-a-loo game, and he got mad." One of the affiants then admonished him that that would not do, and he said: "If Howard is so God damn little as to get mad about a few nickels, somebody ought to kill him, and if he ever says anything else to me about it I will cut his throat." One of the affiants then expressed the hope that there would not be any trouble, and Cochran said: "I am not going to have any trouble. I will just cut his throat and pay for it."

The persons who make this affidavit are accredited by 16 citizens of the county as men of good character and worthy of belief, who frequently visit the town of Camilla and are well known to them. It will be seen that this testimony is in no sense cumulative. It certainly would be competent and admissible for the purpose of showing the quo animo of the decedent just before the homicide, and would be material, and would strengthen the defense relied upon. It would also strongly corroborate the testimony of the two negro witnesses, who were not believed by the jury on the trial (because they were impeached both by contradictory statements and by the fact that one of them was the servant of the accused and the other related to that servant), and would also strongly corroborate the statement of the accused as to what did occur at the time of the shooting.

Another affidavit produced in support of this ground of the motion was made by one who stated therein that he witnessed the

shooting; that he was in a grocery store near the barber shop of the decedent, and heard some one say, "Don't come on me with that knife;" and that, looking to his left, he saw, about 20 feet away, Jim Bob Cochran advancing on Howard Holton with an open knife in his hand, and saw Holton back off some distance, and Cochran going on him with his arm drawn as if attempting to cut him, and then saw Holton shoot Cochran and run off, and then saw Cochran turn and walk back towards his barber shop and fall on his face.

This testimony would be of vital importance to the defense, and, if the jury believed it to be the truth of the transaction, it would probably cause a different result on a retrial, especially when considered in connection with the other alleged newly discovered testimony just considered, and also in connection with the testimony of the two witnesses for the defense and with the defendant's statement, being strongly corroborative of both. It is in a sense cumulative,—that is, it is additional evidence to support the same facts which were set out on the trial. The rule is well established—indeed, it is the language of the statute of this State—that new trials should not be granted for evidence merely cumulative in character. The adverb "merely," in the statute and in the decisions, as qualifying the character of the evidence, is significant. We apprehend that, if the newly discovered testimony as to some facts was that of a witness who was entitled to credit as against the testimony to the same point given by witnesses on the trial who were not entitled to credit or who had been impeached, the testimony would not be merely cumulative; for the additional fact of the character of the newly discovered witness would take it out of that category, at least to some extent, and it is easy to imagine cases in which a fact, although testified to by many witnesses on the previous trial, while not believed because of the character of the witnesses who testified to its existence, yet might be believed without hesitation if, on a second trial, it was testified to by only one witness of unquestioned and unimpeached veracity.

The State made a counter-showing as to the alleged testimony of this proposed witness. Affidavits are produced which attack the general character of the proposed witness, and affidavits are produced tending to show that he was not present and did not witness the difficulty, as he swears. But this affiant's character is sustained

by a half dozen citizens of the county, who swear that his character is good and that he is worthy of belief, and that he worked in the store near the barber shop of Jim Bob Cochran, the decedent. The weight of the testimony of this proposed witness would therefore be an issue to be determined by the jury. They would be authorized to believe him worthy of credit. And in view of the character of the defendant's witnesses who testified to what occurred at the time of the killing, and the very reasonable hypothesis that, because of their relationship to him, they were not worthy of credit, we think he is entitled to have the question of this proposed witness's veracity passed upon by a jury, because the proposed testimony is so vital to his rights under the law.

Courts are very reluctant to grant a new trial on the ground of newly discovered evidence, and we are aware of the well-settled rule that applications of this kind are necessarily directed largely to the discretion of the trial court, and great weight should be given to the judgment of that court with reference to them, and we thoroughly concur in the opinion universally expressed by courts as to the suspicious and unreliable character of applications for new trial on this ground. Public policy demands that when a case has once been fairly and fully tried, and a reasonable opportunity afforded both parties to present all their evidence, it should remain forever at repose. There are cases, however, in which great injustice might result if a party should be denied the benefit of newly discovered evidence. No fixed standard can be established for the measurement of every case, and no iron-bound, inflexible rule supplied, but each case must be governed by the circumstances surrounding it. After all has been said and written on the subject, it seems to us that the true rule is this: If the evidence is in fact newly discovered, if it is material to the rights of the party making the application, and not merely cumulative, if he could not with reasonable diligence have discovered and produced it at the trial, justice and the law demand another trial; for, if the newly discovered testimony is in fact material, it can only be material because it would tend to strengthen the defense relied upon, and would therefore probably lead to a different result.

After giving this ground a most careful consideration, we are satisfied that it measures fully up to these essentials, and that the accused is entitled, under the law, as well as in furtherance of jus-

tice, to have an opportunity of presenting this new evidence, which is of vital materiality to his defense; and we are strengthened in this view by the fact that, although justifiable homicide in self-defense was relied upon at the former trial, it was supported by witnesses whom the jury were fully authorized to discredit, because of their character and relationship to the accused. Solely for the reasons above discussed, we are constrained to reverse the judgment of the lower court, overruling the motion for a new trial.

*Judgment reversed.*

POWELL, J., dissenting. I regret that I can not agree with my colleagues as to a reversal because of the newly discovered evidence. Personally my sympathies nearly always go out to the defendants in criminal cases, and they go out to this defendant; but as a judge I do not believe that I can honestly say that the trial judge misjudged the importance of the alleged newly discovered testimony and abused his discretion in refusing a new trial. I am very reluctant to grant new trials for newly discovered evidence, unless it be of considerable importance.